IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

KEITH PAGE,                                )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )          CIVIL ACTION NO. 1:08-00023
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Supplemental Security Income (SSI), under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. This case is presently pending before the Court on

the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 13.) Both parties

have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 5

and 6.)

The Plaintiff, Keith Page (hereinafter referred to as "Claimant"), filed an application for SSI

on September 16, 2005, alleging disability as of November 7, 2002, due to right ankle problems,

asthma, hepatitis C, liver cirrhosis, anxiety, and depression.[1] (Tr. at 14, 57, 60, 65-72, 113.) The

claim was denied initially and upon reconsideration. (Tr. at 57-59, 60-62.) On June 21, 2006,

---

[1] Claimant filed prior applications for disability insurance benefits (DIB) pursuant to Title
II of the Social Security Act, 42 U.S.C. §§ 410-433, and SSI, on November 20, 2007, alleging
disability as of November 7, 2002. (Tr. at 14, 103-04.) The claims were denied initially and upon
reconsideration. (Tr. at 14.) By decision dated March 23, 2005, an ALJ denied Claimant's
applications. (Tr. at 14, 103-04.) The ALJ's decision became the final decision of the Commissioner
on July 21, 2005, when the Appeals Council denied Claimant's request for review. (Tr. at 14, 103-
04.) Claimant took no further action. (Tr. at 14.)

Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 49.) The hearing was held on January 30, 2007, before the Honorable Karen B. Peters. (Tr. at 428-65.) By decision dated March 29, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-25.) The ALJ's decision became the final decision of the Commissioner on November 19, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On January 9, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2007). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

2

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a).[2] First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

---

[2] As noted above, these Regulations were substantially revised effective September 20, 2000. *See* 65 Federal Register 50746, 50774 (August 21, 2000).

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since November 7, 2002, his alleged onset date. (Tr. at 16, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from residuals of right ankle fracture, asthma, hepatitis C, cirrhosis, gastritis, and depression, which were severe impairments. (Tr. at 16, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, as follows:

> [T]he claimant has the residual functional capacity to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk six hours in an 8-hour workday; sit about six hours in an 8-hour workday; and occasionally balance, stoop, kneel, crouch, and crawl, but should not climb. Due to asthma, he needs a clean, temperature controlled environment; and should not work around harsh

chemicals. Because he has hepatitis C, he should not work in the food industry. He also needs good access to the bathroom. Due to the impact of his impairments, he has moderate reduction in concentration, defined as limited to simple, non-complex tasks, and should not work with the public.

(Tr. at 20, Finding No. 4.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 24, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a general production worker and production inspector/grader. (Tr. at 25-26, Finding No. 9.) On this basis, benefits were denied. (Tr. at 25, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

6

Claimant's Background

Claimant was born on February 5, 1964, and was 42 years old at the time of the administrative hearing, January 30, 2007. (Tr. at 24, 65, 433.) Claimant had a high school education. (Tr. at 24, 117.) In the past, Claimant worked as a maintenance worker, cook, and manager. (Tr. at 24, 461.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) failed to engage in sufficient analysis of Claimant's credibility, (2) improperly assessed Claimant's lack of medical treatment and improperly inferred a lack of serious condition, and (3) failed to give appropriate weight to Claimant's treating physician's opinion. (Document No. 12 at 4-7.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 13 at 8-12.)

Analysis.

1. Pain & Credibility Assessment.

Claimant first alleges that although the ALJ correctly cited the credibility standard, she failed to follow the standard she recited. (Document No. 12 at 4-6.) Specifically, Claimant argues that the ALJ improperly determined that Claimant's failure to stop smoking, which would have alleviated certain symptoms, meant that "the symptoms are not so debilitating as to preclude all work activity." (Id. at 5.) Furthermore, Claimant argues that the ALJ did not "present, or give weight to, the debilitating effects of the claimant's 41 weeks of interferon treatment which ultimately led to a

suicide attempt resulting in a coma and a pattern of hallucinatory behavior." (Id.) Claimant contends that a "general reference to the record is not sufficient to satisfy the requirement of providing specific findings and making credibility determinations." (Id.)

The Commissioner asserts that in making her credibility determination, the ALJ "complied with the controlling regulations and Fourth Circuit precedent and supported her finding with substantial evidence." (Document No. 13 at 8.) Despite Claimant's contentions to the contrary, the Commissioner asserts that the ALJ specifically considered each of Claimant's impairments at step two of the credibility assessment. (Id. at 9.) First, the ALJ discussed Claimant's ankle impairment and noted that he neither took any pain medications, nor had been referred to a specialist for treatment, and that the hardware from a previous surgery was in excellent position and well healed. (Id.) Second, the ALJ discussed Claimant's asthma and noted that he had normal respiratory rate and pattern, that he was non-compliant with treatment recommendations, and that he continued to smoke. (Id.) Third, the ALJ discussed Claimant's gastritis and noted that he took medication and was advised to avoid certain foods. (Id.) Fourth, the ALJ discussed Claimant's treatment for Hepatitis C and noted that a January 2006, hepatic panel was within normal limits. (Id.) Finally, the ALJ discussed Claimant's depression and noted his limited treatment, as well as an assessed GAF of 60, which did not support a finding of disabled. (Id.) Furthermore, in support of the ALJ's credibility finding, the Commissioner asserts that the ALJ pointed out that Claimant's reported activities were inconsistent with a finding of disabled. (Id. at 10.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2007); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If

such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2007). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2007).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms and credibility. (Tr. at 20-22.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 22.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 22-24.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 22.)

The ALJ summarized Claimant's testimony in his decision, noting that Claimant stated that he had ankle pain, breathing problems, hepatitis C, gastritis, and depression. (Tr. at 21-22.) The ALJ thus noted the nature and location of Claimant's pain and other symptoms, and further noted the

11

testimony that he had problems going up and down stairs, had diarrhea about an hour after he ate anything, could not be around people, and had problems with concentration and recent memory. (Id.) She noted a past suicide attempt when Claimant was undergoing the 41 week interferon therapy for his hepatitis C. (Tr. at 21.) The ALJ also noted that Claimant reported vision problems and that he could not see far away, that he had difficulty raising his left arm due to a prior shattered collarbone, that he had a hernia and gout, and that he could not be on his feet and estimated his ability to stand for only one half hour in duration. (Tr. at 22.)

Regarding Claimant's physical impairments, the ALJ noted that Claimant had ankle pain but had not been referred to a specialist for treatment, though he exhibited some decreased range of motion of the right ankle and a mild limp. (Tr. at 22.) The x-rays however, demonstrated excellent position of the hardware from a previous surgery and that his prior ankle fracture was well healed. (Id.) Respecting Claimant's breathing problems, the ALJ noted that ventilatory studies and x-rays revealed only minimal restrictive defect and minimal obstructive pulmonary disease. (Tr. at 22, 188, 191.) Drs. Kistner and Patel observed on physical examinations that Claimant had normal respiratory and rate pattern with no evidence of rales, rhonchi, wheezing, or rubs. (Tr. at 22, 213-51, 335-417.) Claimant used an Albuterol inhaler as needed for treatment, which was effective, but was "noncompliant with medical treatment which would improve his symptoms." (Tr. at 22.) The ALJ noted that Claimant continued to smoke one and one half to two packs of cigarettes per day. (Tr. at 22.) The ALJ therefore found that Claimant's "failure to follow prescribed treatment leads to the conclusion that the claimant's discomfiture is not wholly disabling, since having the means to alleviate symptoms, he fails to utilize those means, presumably, the symptoms are not so debilitating as to preclude all work activity. (20 CFR § 416.930 and Social Security Ruling 82-59)." (Tr. at 22.)

The ALJ next noted that Claimant was being treated by a gastroenterologist with Prevacid

12

for gastritis, and was advised to avoid foods that aggravated his condition. (Tr. at 22, 229.) The ALJ also discussed Claimant's liver impairment, but noted that a hepatic panel on January 23, 2006, was within normal limits, which indicated that his hepatitis C was stable. (Tr. at 22, 189, 203.) Dr. Craft noted on consultative examination on January 23, 2006, that Claimant was treated for hepatitis C and that he was well nourished and free of any nutritional deficiency, jaundice, or liver enlargement. (Tr. at 22, 189.) On November 15, 2006, Claimant's treating physician, Dr. Kamalesh Patel, M.D., assessed that there was no evidence of hepatic coma and that his chronic hepatitis C was resolved. (Tr. at 319.) Claimant denied diarrhea at that time. (Tr. at 316.) The ALJ noted that after Claimant completed his interferon treatment, he no longer felt like he had the flu. (Tr. at 22.) The ALJ thus determined that the medical evidence failed to "support the degree of functional limitations alleged by the claimant and allegations of functional loss are also undermined by the lack of any intensive or extensive treatment. (Id.)

Regarding Claimant's mental impairments, the ALJ noted that Claimant never sought treatment with a mental health professional until after he overdosed in September, 2005. (Tr. at 22.) However, the treatment records from Southern Highlands demonstrated that his symptoms improved with treatment through July, 2006. (Tr. at 22, 266-80, 328-31.) The ALJ noted that Claimant's symptoms coincided with the anniversary of the death of his younger brother and the declining health of his mother. (Tr. at 22-23.) Although Claimant stopped going to Southern Highlands because his wife was not able to drive him, he continued medication management with Dr. Patel and the most recent mental health treatment record demonstrated that he was emotionally improved and stable with medication. (Tr. at 23, 328-29.) Furthermore, despite some psychological symptoms, Claimant was assessed with a GAF of 60, which is indicative of mild to moderate symptoms. (Tr. at 23, 328.)

The ALJ also summarized in her decision, Claimant's testimony regarding his activities of daily living, including his testimony that in 1995, he quit his job as a cook to help care for his terminally ill mother for approximately eighteen months. (Tr. at 21, 445-47.) Claimant testified that he cooked meals once a week and went to the restaurant where his wife worked at other times and took his meals home. (Tr. at 21, 458-59.) He testified that he did not socialize with anyone or attend church, and that he used to hunt and fish. (Tr. at 21, 457.) On a form Function Report - Adult, dated October 1, 2005, Claimant reported that he performed self-care, fixed sandwiches and prepared frozen dinners on a daily basis, washed dishes, folded laundry, shopped for food, and was able to pay bills, count change, handle a savings account, and use a checkbook or money orders. (Tr. at 23, 80-83, 93.) He reported his hobbies and interests to include watching television and drawing, he talked on the telephone, and visited family when he felt like going out. (Tr. at 23, 84.) On a form Questionnaire dated July 27, 2006, Claimant reported that he fixed sandwiches, watched television, and helped out with small things around the house. (Tr. at 23, 131-32.) The ALJ noted that on October 9, 2005, Claimant reported to Patty Flanagan, LPC, at Southern Highlands, that he spent most of his time doing little chores, watching television, using the computer, or drawing. (Tr. at 23, 279.) He reported that he used to enjoy fishing but that he no longer had the time to enjoy that activity. (Id.)

The ALJ "is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [his] decision a statement of the reasons for that decision." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge . . . and it is especially crucial in evaluating pain." Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). The reason being in

14

part because the decision regarding pain and credibility "is often a difficult one, and in part because the ALJ is somewhat constricted in choosing a decisional process." Id.

Based on the foregoing, the undersigned finds that the ALJ properly assessed Claimant's credibility and set forth her explanation. Accordingly, the undersigned further finds that Claimant's argument is without merit and that the ALJ's credibility assessment is supported by substantial evidence.

2. Lack of Medical Treatment.

Claimant next alleges that the ALJ erred in mentioning his lack of mental health treatment because it inferred that his mental condition was not as serious as alleged. (Document No. 12 at 6.) Citing Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994), Claimant asserts that his failure to obtain medical treatment due to the lack of financial resources could not justify such an inference. (Id.) At the administrative hearing, Claimant testified that he had attempted suicide as a result of the ongoing interferon treatment for 41 weeks, and that his treating physician discontinued such treatment because of the suicide attempt. (Id.) Therefore, Claimant contends that the ALJ incorrectly noted that Claimant was not treating; "He was treating, but it was the treatment itself that exacerbated the problems with depression to the point of an attempted suicide." (Id.)

The Commissioner asserts that whether Claimant "lacked resources is debatable because he could afford one and one-half packs of cigarettes a day." (Document No. 13 at 10.) Furthermore, the ALJ did more than infer that Claimant's depression was not serious due to a lack of treatment. (Id.) The Commissioner points out that the ALJ "discussed the reports from Dr. Patel and Southern Highlands that confirm that [Claimant] never suffered from a mental impairment that disabled him for a twelve-month period as required by 42 U.S.C. § 423(d)(1)(A)." (Id.) Accordingly, the Commissioner contends that Claimant's claim regarding depression and his lack of financial

resources should be rejected. (Id.)

Claimant correctly points out that an ALJ may not draw inferences regarding the serious of his mental condition based on his financial inability to obtain necessary treatment. The Commissioner may not deny a claimant benefits on the basis of a failure to seek treatment due to a lack of funds. See Mickles v. Shalala, 29 F.3d 918, 929-30 (4th Cir. 1994); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986). Social Security Ruling 96-7p provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." Claimant cites to Judge Luttig's concurring opinion in Mickles for the proposition that failure to obtain medical treatment due to lack of financial resources does not justify an inference that a medical condition is not as serious as alleged. (Document No. 12 at 6.) In Mickles, Judge Luttig stated as follows:

> While a claimant's failure to obtain medical treatment that she cannot afford cannot justify an inference that her condition was not as serious as she alleges, *see* Lovejoy, 790 F.2d at 1117, an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility. *See* 20 C.F.R. § 416.929(c)(4); *see also* Dover, 784 F.2d at 337. Thus, contrary to Mickles' assertions, it was not improper for the ALJ to consider the level and type of treatment Mickles sought and obtained in determining what weight to accord her allegations of constant disabling pain.

Mickles, 29 F.3d at 930.

In her decision, the ALJ noted that Claimant "never sought treatment with a mental health specialist until after he overdosed in September 2005." (Tr. at 22.) Nevertheless, the ALJ went on to discuss in her decision Claimant's mental health treatment from Southern Highlands through July, 2006, which demonstrated that his condition improved with treatment. (Id.) It appears that Claimant

argues that he was mentally disabled during the 41 week period of interferon treatment. However, the medical notes from Dr. Patel, who monitored Claimant for depression, do not reference any significant mental problems. On March 16, 2005, Claimant complained of depression but Dr. Patel opined that he was emotionally stable. (Tr. at 246-47.) On April 13, 2005, Dr. Patel noted that Claimant complained that the medications were not helping his depression and that he felt aggravated. (Tr. at 241.) Dr. Patel noted however, that his depression was resolved and that he had no suicidal ideation. (Tr. at 242.) He again opined that Claimant was emotionally stable. (Tr. at 243.) On May 11, 2005, Dr. Patel noted that Claimant's depression remained the same and was under fair control. (Tr. at 237.) Claimant was not suicidal and appeared to be emotionally stable. (Tr. at 239-40.) There were no complaints of depression on June 8, 2005. (Tr. at 233-36.) On July 20, 2005, Claimant complained of slight depression, but denied suicidal ideation. (Tr. at 229-30.) Psychological exam revealed that Claimant was alert and oriented and was emotionally stable. (Tr. at 231.) Claimant complained of having felt shaky on August 16, 2005. (Tr. at 225.) Dr. Patel noted however, that Claimant's depression and insomnia were improved, that he had no suicidal ideation, and that he was emotionally stable. (Tr. at 227-28.)

On October 11, 2005, Dr. Patel noted that Claimant was hospitalized from September 7 through September 23, 2005, due to an overdose of Elavil. (Tr. at 221.) Claimant did not remember taking too much of the Elavil and denied suicidal ideation. (Id.) Nevertheless, he was started on antidepressant medications while in the hospital, and Dr. Patel noted that his depression and fatigue had not resolved since his hospitalization. (Id.) Dr. Patel noted however, that his depression had improved and that he appeared emotionally stable. (Tr. at 222-23.) On January 3, 2006, Dr. Patel noted that Claimant's depression had resolved and that he had no suicidal ideation. (Tr. at 218.) As the ALJ noted, subsequent treatment notes from Southern Highlands demonstrated that his

17

symptoms had improved through July, 2006, and that he consistently was diagnosed with a GAF of 60, which indicated only mild to moderate symptoms. (Tr. at 22.)

Accordingly, the Court finds that while the ALJ commented on the lack of mental health treatment prior to September, 2005, which may have been due to a lack of financial means, the ALJ properly considered the progress notes of his treating physician prior to September, 2005, and his progress notes from Southern Highlands thereafter. The ALJ therefore, did not deny Claimant benefits on the sole basis that he was unable to seek treatment due to a lack of funds. The Court finds Claimant's arguments to be without merit and that substantial evidence supports the ALJ's decision regarding Claimant's mental impairments.

3. Treating Physician's Opinion.

Finally, Claimant alleges that the ALJ failed to give greater weight to the opinion of Claimant's treating physician, Dr. Vidot, than to the opinions of the stage agency medical consultants. (Document No. 12 at 7.) Claimant asserts that it "is improper for the ALJ to reject opinions of treating physicians under the regulations set forth by the commissioner [because] the opinion of the treating doctor is to be given more weight than that of a non-treating doctor." (Id.) Claimant further alleges that the ALJ failed to provide "good reasons" for her rejection of Dr. Vidot's opinion. He asserts that "[a]t the very least, the ALJ should have considered granting a closed period of benefits to reflect the 41 weeks that the claimant was undergoing interferon treatments that ultimately reduced him to the point of a suicide attempt." (Id.)

The Commissioner asserts that Dr. Vidot's opinion was unsupport and inconsistent with the other record evidence, and that the ALJ complied with the regulations in according the opinion little weight. (Document No. 13 at 11.) The ALJ considered Dr. Vidot's form report but discounted it because it was unsupported by clinical findings and was inconsistent with a GAF of 60 as assessed

at Southern Highlands. (Id.) In considering the evidence submitted to the Appeals Council, the Commissioner contends that Dr. Vidot's "form report appears even less valid." (Id.) The evidence reveals that in 2006, Claimant's mental examinations essentially were normal and in early 2007, Dr. Vidot reported that Claimant had no anxiety or sadness, was without hallucinations or delusions, made good eye contact, and spoke normally and fluently. (Id.) The ALJ thus asserts that the record evidence supports the ALJ's decision to give limited weight to Dr. Vidot's opinion and that Claimant's argument is without merit. (Id. at 11-12.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2007). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the

Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2007).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2007). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the

adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more

weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2007). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th

Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant case, the evidence of record reveals two Psychiatric Review Technique Forms completed by state agency physicians. (Tr. at 23, 252-65, 281-94.) On March 20, 2006, Dr. Jeffrey Harlow, Ph.D., a Licensed Psychologist, opined that Claimant's affective and anxiety-related disorders were non-severe impairments. (Tr. at 23, 252-57.) Dr. Harlow assessed that these impairments resulted in no more than mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace. (Tr. at 23, 262.) Dr. Harlow specifically acknowledged Claimant's reported activities of daily living, his initial psychological evaluation on November 28, 2005, at Southern Highlands, and a March 13, 2006, report that he was doing all right. (Tr. at 264.) Given the "mild or normal CE report ratings on key functional capacities . . . [Dr. Harlow] concluded that the depressive and anxiety mental impairments are not severe." (Id.)

On June 2, 2006, Dr. Robert Solomon, Ed.D., likewise opined that Claimant's depressive disorder, not otherwise specified, was a non-severe impairment. (Tr. at 23, 281-84.) He opined that Claimant's depression resulted in no restrictions of activities of daily living and only mild difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. at 23, 291.) He also opined that Claimant had experienced no episodes of decompensation of extended duration. (Id.) In addition to the notes reviewed by Dr. Harlow, Dr. Solomon considered a subsequent treatment note from Southern Highlands, dated May 13, 2006, which indicated some improvement and that his domains were within normal limits. (Tr. at 23, 293.) Dr. Solomon found that Claimant's complaints were "very sketchy, & predominantly physical." (Id.) He found Claimant credible, but

concluded that his mental impairments were non-severe. (Id.)

On January 25, 2007, Claimant's family physician, Dr. Millie Vidot, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), on which she opined that Claimant had slight limitations in his ability to understand, remember, and carry out short and simple instructions. (Tr. at 23, 333.) However, Dr. Vidot opined that Claimant was moderately limited in his ability to perform the following activities: understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; respond appropriately to work procedures in a normal work setting; and respond appropriately to changes in a routine work setting. (Tr. at 23, 333-34.) Dr. Vidot noted that Claimant was diagnosed with major depression, had a past suicide attempt, was short-tempered, and had a mood and behavior disorder. (Id.)

As discussed above, Claimant treated at Southern Highlands from October 4, 2005, through July 20, 2006. (Tr. at 23, 266-80, 328-31.) Progress notes demonstrated that as of July 20, 2006, Claimant's last date of treatment, he was diagnosed with depressive disorder, not otherwise specified, and rule out anxiety disorder. (Tr. at 23, 328.) He was assessed with a GAF of 60, which as indicated above, indicated only mild to moderate symptoms. (Id.) Mental status examination revealed that he interacted well and was cooperative, made direct eye contact, and that his mood was stable and affect was appropriate. (Tr. at 23, 328.) Claimant's speech was appropriate and goal directed, his sleep was adequate and appetite was good, his energy was improved, and he reported no suicidal or homicidal ideation. (Tr. at 23, 329.) His stream of thought was normal, logical, and goal directed and his content of thought was appropriate and informative. (Id.) Claimant denied hallucinations and his insight and judgment were fair. (Id.) Claimant was oriented to place, person, time, and situation; was alert and oriented; and had good recent and remote memory. (Id.) It was

24

noted that his mental condition had improved with medication, for which he experienced no side effects. (Id.)

The ALJ considered Dr. Vidot's opinion, but noted that he saw Claimant only when he was hospitalized for an overdose in September, 2005. (Tr. at 23.) Though Claimant testified that Dr. Vidot was his family physician, the medical record contained no offices notes of treatment. (Id.) The ALJ therefore concluded that Dr. Vidot "relied heavily on claimant's overstated complaints and self-imposed limitations in reaching his conclusions. No other explanation for these limitations was offered nor was any additional evidence submitted post hearing by counsel in support of these findings." (Id.) The ALJ therefore, accorded only some weight to Dr. Vidot's opinion. (Id.) The ALJ also considered the medical records from Southern Highlands and found that Claimant improved with medication and that the assessed GAF of 60 indicated that Claimant "was functioning in the borderline range between mild and moderate symptoms of limitations from a mental impairment." (Id.) Finally, the ALJ acknowledged the opinions of the non-examining, state agency medical sources. (Id.) The ALJ stated that she concurred "with the opinions of the State agency reviewing physicians who determined the claimant could perform a range of light work with the postural and environmental limitations identified." (Id.)

Based on the foregoing, the Court finds that the ALJ properly considered the opinion evidence of record in conformity with the Regulations. Substantial evidence supports the ALJ's decision that Dr. Vidot's opinion was neither supported by any clinical findings nor was consistent with the progress notes and GAF of 60 as reported by Southern Highlands. As the Commissioner points out, the medical records from Dr. Vidot, which were submitted to the Appeals Council, supports the ALJ's decision. On May 30, 2006, Dr. Vidot diagnosed major depressive disorder, but noted on exam that Claimant's speech was normal and fluent, he had good eye contact and

25

appropriate behavior and mentation, his thought process and content were normal, he had normal judgment and insight, and that he was oriented to person, place and time. (Tr. at 427.) On August 10, 2006, Claimant reported depression, nervousness, and insomnia. (Tr. at 423.) However, mental status examination again revealed normal speech, eye contact, behavior and mentation, thought process and content, judgment, and insight. (Tr. at 424.) On January 23, 2007, Dr. Vidot noted that Claimant was short-tempered but that his mood and appetite were good and that he had no suicidal ideation. (Tr. at 420.) A review of systems revealed no sadness, anxiety, homicidal or suicidal ideation, or hallucinations. (Id.) Dr. Vidot noted that Claimant was alert and oriented, that his mood was normal, that he had good eye contact, that his speech was normal and fluent, and that he had no anxiety, sadness, hallucinations, or delusions. (Tr. at 421.)

Accordingly, based on all the evidence of record, the Court finds that the ALJ's decision to accord only some weight to the opinions of Dr. Vidot is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: March 31, 2009.

R. Clarke VanDervort
United States Magistrate Judge

26